IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| VS. § | NO. S1-14-CR-483-04(LAP) |
| § | |
| JUAN PIMENTEL § | |

**SENTENCING MEMORANDUM
ON BEHALF OF JUAN PIMENTEL**

Through counsel, Juan Pimentel files the following Sentencing Memorandum setting forth all factors that the Court should consider the type and length of sentence that is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

It is incumbent on this Court to, "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensure." *Koon v. United States,* 518, U.S. 81, 113 (1996).

On September 10, 2015, this Court will sentence Mr. Pimentel for violation of 21 U.S.C. § 841(b)(1)(C), for which he plead guilty. In addressing the sentencing issues regarding Mr. Pimentel, this Memorandum will consider, among other things, the factors presented in 18 U.S.C. § 3553(a), including the calculations by the Unites States Probation Officer, and consideration of any downward departures and/or variances.

In this case, the Sentencing Guidelines recommend a range of 78-108 months of imprisonment. Mr. Pimentel respectfully submits this sentencing memorandum to demonstrate to

1

the Court why a sentence of supervision (probation) is sufficient, but not greater than necessary to comply with the sentencing objectives set out in 18 U.S.C. § 3553(a).

**APPLICATION OF 18 U.S.C. § 3553(a) SENTENCING FACTORS**

In the case before this Court, the following sentencing factors must be considered when determining the type, and length of sentence that is deemed sufficient, but not greater than necessary, to satisfy the purposes of sentencing:

1. **The Nature and Circumstances of the Offense and the History and Characteristics of the Offender**

    (a) Nature and Circumstances of Offense

    Mr. Pimentel has been charged and pled guilty to one (1) count of conspiracy to distribute and possess with intent to distribute one (1) kilogram or more of heroin, in violation of 21 U.S.C. § 841(b)(1)(c). The Presentence report accurately recounts the offenses, notwithstanding the pre-sentence objections that were lodged and sent to Mr. Johnny Kim on June 29, 2015, via electronic mail.

    Mr. Pimentel was, for all intents and purposes, a low-level employee of the Drug Trafficking Organization ("DTO") who took orders from the organizer of the DTO. The structure of the DTO was such that the organizer of the DTO had a number of people working below him, as well as low-level employees, such as Mr. Pimentel. These low-level employees, or errand boys, would essentially take orders from the organizer with regard to providing drugs to people who came to buy from the DTO.

    The bulk of the wiretaps in this case clearly demonstrate that Mr. Pimentel was not the main contact for anyone looking to buy drugs, and that his role was limited to being the person

(or one of the persons) that the organizer contacted to dole out the orders once an order had been placed.

At the time of the offense, Mr. Pimentel was expecting a baby with his long-time girlfriend, Mariela Gomez. Mr. Pimentel was not working at the time, and expenses were mounting up, and unfortunately, Mr. Pimentel made the mistake of doing work for the DTO as a means of supporting his pregnant girlfriend, as well as his mom and siblings. Mr. Pimentel was not intimately involved in the day-to-day operations of the DTO. He was not aware of how much heroin was being moved, outside of the bundles he would deliver. Additionally, this offense represents the first foray Mr. Pimentel has had with narcotics in his entire life.

**(b) History and Characteristics of Mr. Pimentel**

Mr. Pimentel was born in the Bronx, NY, to a house of poverty, in area of the Bronx where violence and drugs run rampant. Drugs and violence were commonplace and a young Mr. Pimentel was exposed to drugs at a very young age. Mr. Pimentel grew up in an environment where most, if not all, of your friends and classmates were either involved with gangs, or dealing drugs instead of furthering their education. The effect that must have on their psyche is beyond what any of us on the outside looking in, can likely comprehend. To see your family struggling to make ends meet, hoping the heat, or electricity does not get cut off for lack of payment, while working low paying jobs for 8-10 hours each day is difficult. Especially when your friend, who at 16 years of age, makes more in one day selling drugs than your mom makes in three months. It doesn't excuse the behavior by any means, but it certainly makes it easier to understand how

someone could be led to a life of crime when they grow up in an environment such as the one Mr. Pimentel grew up in.

Mr. Pimentel had both a mother and father, initially who raised him. It was a life that seemed very normal early on, by all accounts. However, when Juan was around 8 years old, Juan's father's behavior went from loving to abusive. Fights involving the family began to happen constantly. Juan's father's aggressiveness and his violence towards Juan and his mother escalated. In 1998, Juan's father, Francisco Pimentel, abandoned his family forever, forcing Isabel to provide for herself and her family of three children. It would be the last time that Juan ever saw his Dad. The only benefit was that the children and Isabel were not subjected to any more domestic violence from Francisco. Mrs. Pimentel, by all accounts, was a good mother. She made sure her children were always fed before herself.

When Juan was 12 and living at 168th St and Sheridan Ave in the Bronx, Isabel sent him to the store. When he returned, Juan found the residents of the building outside and many firefighters. He saw people being evacuated through their windows, as the building burned down, and the Pimentel's were left without a home and only the clothes on their backs. Juan's mom and brother were trapped in the fire. Juan's mom had 2nd and 3rd degree burns on her head, and she almost died in the hospital. Juan's brother was just a few months old at the time of the fire, and narrowly escaped by the grace of a Good Samaritan.

Due to financial hardship, the Pimentel family lived in a shelter, Ruth Hernadez, in Hunt's Point, in the Bronx. During this time, Mr. Pimentel's family had literally nothing. Due to the horrific emotional toll of losing his home and all his possessions, Juan was sent to therapy

and counseling for depression. He was afraid to lose his family to another fire. Around this time, Juan began skipping school to be alone with his thoughts. Juan was always depressed, and life was hard for him not having a father, a home, or basic necessities.

Juan began failing in school. He was scared to attend class, and spent his time walking the hallways. After the fire, he became withdrawn and quiet. Juan and his brother had to wear the same clothes often, hand-me-downs that didn't fit, and their classmates constantly bullied them due to their station in life. Juan dropped out of school in the 10th grade. Juan did not have the guidance and support of any positive male role model during his childhood, and adolescence. He sought the approval and affection he lacked from a father figure, from the guys he hung out with in his neighborhood.

Despite lacking a father figure to teach him the importance of hard work, Mr. Pimentel was employed throughout the years following high school, leading up to the instant arrest. His problems stemmed from the fact that he never finished high school, and thus was precluded from ever finding a decent paying job. He could not further his education by going to college since he did not have his GED or high school diploma. He knew that his mother struggled to support him and his siblings, so it was incumbent upon Mr. Pimentel to help pay the monthly bills the family had by working low paying jobs.

Mr. Pimentel loved his siblings and mother very much. He understood that he had a duty to assume the role a father would have, and this included financial and family support.

As for his criminal history, prior to this instant offense, Mr. Pimentel had never been arrested. This was not because he was an extremely careful criminal, but rather because he did

not lead a life of crime until he started working for this particular DTO. Prior thereto, Mr. Pimentel always had legitimate jobs.

Mr. Pimentel is deeply remorseful for his conduct and is acutely aware that he has possibly wrecked his entire life, and that of the life of his young son. This is most closely demonstrated by the behavior Mr. Pimentel has exhibited since he was arrested for this offense. He has been on bail since the beginning of this case. Initially, he was on home confinement, required to be in home all day long. He was also on GPS monitoring to ensure his compliance. Mr. Pimentel was compliant with every mandate that the pre-trials services office required of him. He was complaint to the extent that his pre-trial supervision officer, Erica Cudina, recommended to this Court that he be switched from home-confinement, to home-detention[1].

This change allowed him to secure a job, and begin his GED classes. Juan has taken and passed 2 of his 5 GED Classes. He is taking the remaining three in late September. For Mr. Pimentel, this change allowed him to gain a new perspective on life. For the first time in his life, as a father, Mr. Pimentel was working an honest job, doing construction work, and providing for his girlfriend and newborn son. Juan is working full time for a construction company, Summit Waterproofing and Restoration, and the foremen intend to keep him as a permanent employee for his ability to get the job done while being extremely reliable. During this time, Juan received his OSHA licenses for Construction Safety and Health, and Supported Scaffold User. While the work he performed eight (8) hours a day was hard work, it was very demonstrative for him, now

---

1 Ms. Cudino later contacted my office in July 2015, to ask me to request that his bail conditions be modified from home detention, to GPS monitoring with hours to be set by pre-trial services due to his track record of compliance.
2 The Comprehensive Crime Control Act of 1984 makes probation a sentence in and of itself. 18 U.S.C. § 3561. Probation may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for the law,

6

as a father. He saw for the first time in his life that there were more important lives at stake than his own. His conduct and actions no longer only had repercussions for him. Instead, he learned that his son, and those around him counted on him to be there for them financially, morally, and spiritually. Mr. Pimentel knew firsthand the devastating loss he felt when his own father abandoned him at a young age. He knew that by going to prison he would be abandoning his son as well. Mr. Pimentel knows he would never again make those same choices he made that got him in to this situation to begin with. He now has a life to care for outside of his own.

It is for this reason that Mr. Pimentel respectfully requests that he be placed on supervision for this offense, as this is a sentence that is sufficient, but not greater than necessary, to comply with the sentencing factors found in 18 U.S.C. § 3553(a).

**2.   The Need for the Sentence Imposed To Promote Certain Statutory Objectives:**

**(a) To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense**

Section § 3553(a)(2)(A) requires the judge to consider "the need for the sentence[2] imposed…to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Whenever a sentence exceeds that which is considered fair, or appropriate, given the nature of the offense, it tends to promote disrespect for the law, and unjust

---

[2] The Comprehensive Crime Control Act of 1984 makes probation a sentence in and of itself. 18 U.S.C. § 3561. Probation may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant. USSG, Chapter 5, Part B – Probation, Introductory Commentary.

punishment follows. The objectives of § 3553(a)(2)(A) have been referred to collectively, as "retribution," which has been defined as follows:

> First, retributive, or "just deserts," theory considers only the defendant's past actions, not his or her probable future conduct or the effect that the punishment might have on crime rates or otherwise. Second, retribution examines the actor's degree of blameworthiness for his or her past actions, focusing on the offense being sentenced. Third, the degree of blameworthiness of an offense is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity.

Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?,* 89 Minn. L. Rev. 571, 590 (February 2005).

Therefore, when examining these factors, this Court should consider the following:

1) While Mr. Pimentel accepts responsibilities for his wrongdoing, his culpability is diminished based on the following:

   A) His conduct represents the first time he has ever dealt with narcotics;

   B) He was recruited by an acquaintance to work for the DTO;

   C) He was motivated by his desire to provide for his girlfriend, who was 6 months pregnant at the time;

   D) He entered a timely plea to the charge without so much as filing a motion; and

   E) He has demonstrated over the past year his ability to comply with court orders and pre-trial services mandates, including but not limited to curfews, home confinement, no illicit drug usage, and reporting when required.

Mr. Pimentel understands that the consequences of his actions which have brought him before the Court may be a lengthy term of imprisonment which has dissuaded him from ever being involved in any drug dealing offense, or future criminal conduct. Following his arrest, Mr. Pimentel made many positive changes in his life and the past fourteen (14) months demonstrates that he has successfully done just that. By complying with all pre-trial services mandates, he has demonstrated his willingness, and his ability to comply with all court directives, if he were to be placed on probation. He has also demonstrated that he can find and hold honest employment and that he can succeed academically as well.

Incarcerating Mr. Pimentel is certainly not going to solve the problem of drug abuse in America, or even in the Southern District of New York. "[C]riminologists and law enforcement officials testifying before the Commission have noted that retail-level drug traffickers are readily replaced by new drug sellers so long as the demand for a drug remains high. Incapacitating a low-level drug seller prevents little, if any, drug selling; the crime is simply committed by someone else." U.S.S.C., *Fifteen Years of Guidelines Sentencing; An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform,* at 134 (Nov. 2004). The ONDCP has stated that "drug traffickers" and dangerous drug offenders are appropriate for incarceration. *Nat'l Drug Control Strategy* at 52.

The term "drug trafficker" is not to be found in Webster's dictionary. It is a phrase that is often times thrown about for anyone who is convicted of selling any quantity of illicit drugs. However, we can look to the sentences that are handed out, as well as the mandatory minimum sentences set by Congress to understand the difference between a low-level drug offender, or a

low-level employee of a DTO, and a "drug trafficker". Merely by looking at the information supplied by law enforcement, Congress has linked five-year penalties to amounts that were indicative of "managers of the retail traffic," while those who received ten-year sentences were believed to be generally indicative of "manufacturers or the heads of organizations." USSC, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform,* at 11 (Nov. 2004), *available at* http://www.ussc.gov/15_year/chap2.pdf.

Mr. Pimentel was not a manager, or a manufacturer. He was, by all accounts, an errand-boy; a low-level employee that was not responsible for anything aside from doing what he was told to do by the head of the organization. On the other hand, Mr. Pimentel is cognizant of the fact that his actions were wrong, and there are consequences for these actions. He simply argues that his involvement does not rise to the level of a manufacturer, manager, or drug trafficker. Accordingly, Mr. Pimentel argues that his involvement with this DTO, and his lack of managerial responsibility or conduct, within the DTO would indicate that a sentence of probation would be sufficient, but not greater than necessary to achieve the goals of 18 U.S.S.C. § 3553(a).

A sentence of probation in this case would reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

**(B) To afford adequate deterrence to criminal conduct**

Deterrence of future criminal conduct is a major goal in federal sentencing, and as such it is typically a key point of analysis at the sentencing stage.

The Sentencing Commission has previously found that, "[t]here is no correlation between recidivism and guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." *See* USSC, Measuring Recidivism at 15, http://www.ussc.gov/publicat/Recidivism_General.pdf.

Mr. Pimentel is very unlikely to reoffend. We know this by seeing the stark change in the man Mr. Pimentel has grown to be in just the past fourteen (14) months he has been on bail. The fact that he was on bail would deter, but not prevent Mr. Pimentel if he so chose to continue his associations with those who sold drugs. However, Mr. Pimentel has completely turned his life around. While he never used illicit drugs to begin with, he stopped drinking alcohol completely. He began attending church regularly, and he was an actively involved father to his recently turned 1-year-old son. He certainly knows what life without a father is like. He doesn't wish this on anyone, let alone his own son. His son is as much an incentive to lead a law-abiding life, as the threat of being thrown in prison for failing to comply with probation conditions. He has a double-incentivized system to ensure he never breaks the law again.

A sentence of imprisonment would not necessarily have an effect on deterring future criminal conduct. "According to the best available evidence…prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science.* 91 Prison J. 48S, 50S-51S (2011).

There is ample research to suggest that when criminal defendants are given lengthy, or even relatively short prison sentences, they are more likely to recidivate than defendants who are

11

given probation. Valerie Wright, *Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment 7* (2010), available at http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf. The rationale behind this is simple: those who go to prison either become institutionalized due to the lengthy amount of time they stay behind bars, or they gain new associates who plot their next criminal move upon release from prison. Defendants who are given probation are essentially given a new lease on life with the understanding that any misstep while on probation will land them in prison. This is a pretty strong incentive for many to change their ways and lead a crime-free lifestyle.

      Mr. Pimentel is 25 years old. He lives with his girlfriend, Mariela Gomez, who is also the mother to his only child, Matthew Xavier Pimentel. Mr. Pimentel has no history of drug use, and seldom-abused alcohol growing up. He has been alcohol free since this case originated. He has also been employed for most of his adult life. For defendants who are married, or living with the mother/father of their children, and for those who do not use or abuse alcohol or drugs, the rate for recidivism is even lower than those who are merely married, or merely employed. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Exh. 9, at 28; Exh. 10, at 29 (May 2004) [hereinafter *Measuring Recidivism]*.

      Mr. Pimentel has never been imprisoned for anything in his life, outside of this case. The mere threat that prison is the next stop should he not comply with any court ordered condition of probation is sufficient enough to ensure the public is protected from any further crimes of the

defendant. One need only look at the behavior exhibited over the last 14 months to see the lifestyle change by Mr. Pimentel.

This Honorable Court, after considering the need to deter Mr. Pimentel from any future criminal conduct, should find that a sentence of probation is sufficient, but not greater than necessary based on the need to provide adequate deterrence.

### (C) To Protect the Public From Future Crimes of the Defendant

Mr. Pimentel committed no crimes in the twenty-six (26) years he has been alive, notwithstanding the current charge. This is especially surprising given the criminal breeding grounds from which he was born and raised in.

There are people in society that the courts have a duty to protect the public from. These people have no regard for the law, and break the law while harming innocent people without so much as a second guess. Sadly, no amount of incarceration will change them, or their dangerous pattern of behavior. There is nothing that can control them outside of incarceration.

However, someone who has been charged with a one non-violent crime in 26 years is hardly the type of person the general public is afraid of. I would suggest that despite the potential carnage that ensues behind those who deal drugs, it is still not someone the courts and the Judicial system were created to protect the public from by incarcerating all of them. While some of the drug offenders in the Federal Judicial system have no option but to serve a term of imprisonment, there are some who would benefit most by a term of probation. There are some who are still worth saving. There are still some whose crimes have not inflicted the type of

destruction that cannot be undone. For these few individuals, they can turn their lives around and atone for the wrongs they have committed, without serving a term of imprisonment. Mr. Pimentel is one of these people. He is someone who clearly owes a debt to society for his actions. However, society would best be served by allowing Mr. Pimentel to remain in the community and serve the community doing all Court mandated community service, and complying with all other conditions the Court sees fit. The community could benefit from someone who has been given a second chance in life and changed their lifestyle to be a positive role model for the next generation of kids who are thinking about heading down the same path that Mr. Pimentel ultimately chose to take.

Therefore, a term of probation is sufficient but not greater than necessary to afford adequate deterrence to criminal conduct, while affording Mr. Pimentel the opportunity to prove to the Court that he will continue to comply with all Court ordered directives as he has done for the past fourteen (14) months.


**(D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

Mr. Pimentel is in good psychological health, and does not abuse drugs or alcohol. He is also currently employed by a construction company as he has been for the past several months. He is currently taking the test for his GED, in order for him to be able to continue with is education at the collegiate level. He has already passed two of the five portions of the GED and is scheduled to take the examinations for the remaining 3 portions, on September 18, 2015.

Therefore, Mr. Pimentel is not in need of any educational, vocational, medical, or drug treatment that may be offered through the Bureau of Prisons.

**3.     The Kinds of Sentences Available**

In *Booker,* the Supreme Court severed and excised 18 U.S.C. § 3553(b), the portion of the federal sentencing statute that made it mandatory for courts to sentence within a particular sentencing guidelines range. *Booker,* 125 S. Ct. at 756. This hereby renders the sentencing guidelines advisory. *Id.*

The offense that Mr. Pimentel was convicted of is a Class C felony, 18 U.S.C. § 3559(a)(3). As a result of this case being a Class C felony, Mr. Pimentel is eligible to be sentenced to straight probation. The statutory maximum penalty in this case is twenty (20) years in prison.

**4.     The Sentencing Range Established by the Sentencing Commission**

Mr. Pimentel does not contest the guideline range as calculated in the Pre-Sentence Report. However, this guideline range is greater than necessary to achieve the goals of 18 U.S.C. § 3553(a), and a variance to a term of probation would sufficient, but not greater than necessary in this case.

**5.     The Need To Avoid Unwarranted Disparities**

It is incumbent on this Court to, "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the rime and the punishment to ensue." *Koon v. United States,* 518, U.S. 81, 113 (1996).

In this conspiracy, to date, two co-conspirators have been sentenced – each to time served and supervised release for three (3) and five (5) years respectively.

Ms. Rodriguez was identified by the Government as someone much higher within the organizational hierarchy in the DTO than Mr. Pimentel was. "Indeed, Rodriguez appears to have exercised some degree of oversight responsibility over other DTO workers involved in processing heroin at the stash location. " (Gov. Brief re: Rodriguez p. 3)(ECF #153) "DTO Workers also reported to Rodriguez on the status of heroin sales at the distribution location." *Id.* Additionally, the Government goes out of its way to point out that Ms. Rodriguez was more culpable than other co-defendants like Mr. Pimentel. "And she played an active role in the DTO's operations. Her logistical role in the organization makes her at least as culpable, if not more culpable, than co-defendants Sanchez, Morillo, Pimentel, Dukes, and Cruz." *Id. at 4.* The Government pointed out that any non-custodial sentence that Ms. Rodriguez was given would create a sentencing disparity. "It would likely create unwarranted sentencing disparities with similarly culpable and less culpable, co-conspirators." *See Id. at 4.*

Mr. Sanchez was likely given a non-custodial sentence followed by supervised release. Mr. Sanchez presented as a much differently situated defendant than Mr. Pimentel, based upon criminal history, role in the current offense, and behavior since the instant case was filed.

Mr. Sanchez's criminal history reflects that this is not his first foray in committing crimes, and in fact, this was not his first drug charge. "He was previously convicted of drugs and firearms-related offenses." (Gov. Brief re: Sanchez p. 4)(ECF #162). Even worse, Mr. Sanchez was committing the instant offense while he already had pending criminal charges in another county. "…the defendant was on pre-trial release for charges in Bronx County, NY for much of the period during which the offense conduct in this case took place." *See Id. at 4.*

Mr. Sanchez was also a much more active participant in the DTO than Mr. Pimentel. This is evidenced by the fact that his personal vehicle was rigged with a trap. *See Id. at 4.* "Drug traffickers modify the vehicle and put different traps – or secret compartments – inside. So even if the car is stopped and searched, the drugs are hard to find." *Do's And Don'ts of a Vehicle Drug Search, (New York Times,* March 27, 1994). *Available at:*

http://www.nytimes.com/1994/03/27/nyregion/do-s-and-dont-s-of-a-vehicle-drug-search.html?pagewanted=1

This evidence suggests that Mr. Sanchez was not just an errand-boy, or low-level employee of the DTO, but rather, was higher up the chain of command if he was outfitting his vehicle with such devices to elude law enforcement. Traps tend to suggest a continuous course of conduct over a long period of time, as opposed to merely taking orders from the organizer of a DTO. was not a first time criminal like Mr. Pimentel.

Lastly, Mr. Sanchez was involved in a fracas while incarcerated that was so serious, he was stripped of visitation privileges for ninety (90) days. *See Id. at 4.* While the environment

inside a custodial facility is vastly different than home confinement, Mr. Sanchez's behavior is indicative of someone who continues to live an unchanged lifestyle.

The need to avoid disparity must be considered. Mr. Pimentel's involvement in this case, along with his lack of previous criminal history clearly indicate that his situation is distinctly less culpable than either Ms. Rodriguez or Mr. Sanchez. Accordingly, a sentence of probation is warranted in this case to avoid an unnecessary sentencing disparity.

**6.     The need to provide restitution to any victims of the offense**

Pursuant to 18 U.S.C. § 3663A, Mr. Pimentel is not required to pay restitution in this matter.

### Conclusion

For the foregoing reasons, Mr. Pimentel respectfully submits that a sentence of probation is sufficient but not greater than necessary to comply with the statutory directives set forth in 18 U.S.C. § 3553.

Respectfully submitted this 31[th] Day of August 2015.

      /s/   Jeffery L. Greco
Greco Neyland, P.C.
Jeffery L. Greco
Attorney for Mr. Pimentel
261 Madison Ave., 12th Floor
New York, NY 10016
212-951-1300 tel.
212-951-1302 fax
jeff@greconeyland.com

**CERTIFICATE OF SERVICE**

      I do hereby certify that on August 31, 2015, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by U.S. mail. Parties may access this filing through the Court's electronic filing system.

                                                 /s/   Jeffery L. Greco